387 P.2d 240

The STATE of Utah, Plaintiff and Respondent,

v.

Terry D. LOUDEN, Defendant and Appellant.

No. 9851.

Supreme Court of Utah.

Dec. 11, 1963.

2. Reese v. Harper, 8 Utah 2d 119, 329 P. 2d 410.

---

Robert C. Cummings, Salt Lake City, for appellant.

A. Pratt Kesler, Atty. Gen., Ronald N. Boyce, Asst. Atty. Gen., Salt Lake City, for respondent.

CROCKETT, Justice.

Defendant appeals from conviction of second degree burglary charging that the trial court erred in: A) admitting evidence claimed to have been obtained by an unlawful search and seizure; B) refusing to try in the absence of the jury the issues as to the voluntariness of his alleged confession; and C) refusing to give certain instructions pertaining to the confession.

A) The admission of evidence obtained by the search.

We have no disposition to disagree with the doctrine that where police officers have obtained evidence by illegal methods, such as unlawful search in violation of the IV Amendment to the United States Constitution and Article I, Sec. 14 of our Constitution, it should not be used to convict a person of crime, as held by the United States Supreme Court in the case of Mapp v. Ohio.[1] Although there are admittedly older decisions of this court which indicate that under certain circumstances, evidence even though unlawfully obtained, may be used as evidence.[2]

Our concern here is whether a search of the defendant's motel room was an "unreasonable search" denounced by the mentioned constitutional provisions. In

dealing with this question it should be remembered that there are two aspects of the situation to be considered: respecting the rights of citizens to be free from unwarranted intrusions upon their privacy; and contrasted to this, the rights of the citizenry generally to have their law enforcement officers allowed sufficient freedom in performing their duties to effectively protect the safety of the public and of themselves. In that regard it cannot realistically be expected that officers will keep abreast of the latest rulings of the courts as to the detail of procedures to be followed. They must be allowed some reasonable latitude in carrying on their investigative work. Unless their conduct definitely transgresses the rights of the accused, it is neither the desire nor the proper function of the court to reverse a conviction as a rebuke to the officers because of unintentional failure to follow strictly the requirements of the law.[3] If their conduct is challenged, it should be analyzed realistically with those thoughts in mind.

The officers here knew that a felony, in fact a series of them, had been committed and were investigating them. They went to the defendant's motel room on a "tip." The exact nature and source of the information was not disclosed, as is sometimes advisedly

1. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
2. See State v. Fair, 10 Utah 2d 365, 353 P.2d 615.

3. See People v. Stroble, 36 Cal.2d 615, 226 P.2d 330, 332.

the case in detective work. But it is apparent that it indicated that the defendant was involved and that it was of sufficient reliability that the officers were willing to act upon it. They went to the proprietor of the motel and asked permission to enter, which was granted. The officers found a pistol in a drawer and identified it by serial number as having been stolen in a burglary of Harmon's Shopping Center, a crime which they were attemping to solve. For their own reasons, the officers replaced the pistol in the drawer and waited outside for the occupants to return. They turned out to be the defendant, Louden, and one McQueen. The officers exercised some caution by "frisking" them (tapping their clothing with their hands) for weapons and found none. The officers aver that they then asked if they "could take a look around" to which the defendant replied, "Yes, you can come in and look around." The position of the defendant is that he said, "Would it make any difference if I objected?" They made the search and in addition to the pistol, found two wristwatches and some crowbars which also had come from Harmon's Shopping Center.

 We do not reject the idea that the tenant of a motel room may regard it as his home and claim the privileges that would afford him; nor that the proprietor technically had no right to permit others to enter. Nevertheless, whether the evidence was obtained by an "unreasonable search" denounced by the constitutional provisions referred to is primarily for the trial court upon a survey of the whole situation, having in mind both the rights of citizens and the practical exigencies of police work.[4] Unless its determination appears to be clearly wrong, we will not upset it. As we review the situation, including particularly the request made by the officers to the landlord and the defendant, and the responses thereto, we fail to see anything high-handed or ruthless about the officer's conduct as was present in the case of Mapp v. Ohio, referred to above; nor anything which would compel a conclusion that this was an "unreasonable" search and the rejection of this evidence. Accordingly, we will not reverse the ruling admitting it.

B) Confession.

After the defendant was in custody, in response to questions about the burglary at Harmon's Shopping Center, he told Mr. Parley Blight, the deputy sheriff, " * * * that he went there about 2:30 in the morning, pried open the back door and looked around for the safe and couldn't find it; had rummaged through the cashier's desk and couldn't find any money there, and so he took a pistol, Polaroid camera, various watches and some crow bars."

4. See comprehensive discussions in opinions in Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726.

**68**

Before the officer so testified, the defendant's attorney requested the court for a hearing out of the presence of the jury as to whether the statements he had made to the officer were made voluntarily. He represented that the defendant would claim that the officer told him that if he would tell the facts about the property they had found and help clear up some burglaries, he would not be prosecuted. The State's position is that he was told only that if he would so cooperate that no "other" charges would be filed against him. The court did not grant a request for a separate trial on the issue but indicated that the defendant could put on his evidence in the trial if he so desired.

■ Defendant urges that the statements constitute a confession, and that under the procedure set forth in State v. Crank,[5] he was entitled to have the issue as to its voluntariness determined by the court in the absence of the jury. Whether the statements constitute a confession involving all of the elements of a crime, as contended by the defendants; or are only admissions as to certain facts pertaining thereto, as' insisted by the State, we here have no serious concern.[6] That either a confession or an admission which was procured involuntarily should be excluded is not debatable. This serves two salutary purposes: It guards

against falsehood and removes the motive for securing such evidence by third degree, threats, promises or other improper methods. But the procedure for determining voluntariness is open to some question.

■ It should be borne firmly in mind that it would be the receipt of such unreliable evidence, and not the variation from some suggested method for determining its reliability, which would constitute prejudicial error. There is no statutory mandate as to the procedure to be followed. Nor should there be any rigid and inviolable one. The duty which devolves upon the trial court is to adopt and follow some procedure which will guard against the admission of spurious confessions or admissions. How this is done may vary somewhat depending upon the circumstances of each case, and the court should have considerable latitude of discretion as to how to protect the rights of the defendant in that regard. If that purpose is served, the fact that the course adopted may vary from some other procedure which may also have been deemed permissible, should not result in the reversal of the conviction.

■ It must be borne in mind that the court has not only the duty mentioned to the defendant, it must also safeguard the

5. 105 Utah 332, 142 P.2d 178, 170 A.L.R. 542.
6. That a "confession" involves all necessary elements of crime as distinguished from the less comprehensive "admission," see State v. Masato Karumai, 101 Utah 592, 126 P.2d 1047.

rights of the State. Furthermore, it has the responsibility of seeing that the trial moves forward in an orderly manner and with such reasonable expedition as can be achieved consistent with looking after the interests of both sides of the controversy. It would be quite impractical to halt the main trial, excuse the jury, and conduct a collateral trial on the question of voluntariness of an admission or a confession every time defense counsel might make an objection. While this has indeed been approved as proper procedure under circumstances which require it,[7] it should be done only when there is presented such a genuine and substantial issue as to voluntariness that in the court's judgment there is some real possibility that permitting the jury to hear the evidence would so prejudice their minds that the defendant could not have a fair trial. The latter situation did not exist here.

The fact is that the defendant in practical effect had his initial judicial consideration of his contention. His claim that he was told that if he would "talk" and cooperate he would not be prosecuted at all, considered in connection with the fact that some of the property found in his motel room had been identified as obtained in one of the burglaries, and the much more reasonable version of the officer that he was told only that no "other" charges would be filed against him, reveals the defendant's contention as but a feeble attempt to avoid the consequences of his admissions. The trial court was amply justified in thinking there was no real likelihood that they were gotten from him involuntarily and in denying the request for a separate trial on the issue. He advised that the defendant could put on his evidence in the trial if he so desired. It is obvious that this is the ruling that would have been made and the procedure that would have followed had the issue been tried to the court separately.

C) Instructions.

We have given due consideration to the points raised as to refusal to give instructions. The issues were adequately covered, and we find no prejudicial error therein.

Affirmed. No costs awarded.

McDONOUGH, CALLISTER and WADE, JJ., concur.

HENRIOD, Chief Justice (concurring in the result).

I concur in the result. It is difficult for me, however, to see how the main opinion can pay reverence to Mapp v. Ohio, and then distinguish it, where, as here, no warrant was used, and where the violence involved simply was one of degree. I am of

---

7. See State v. Braasch, 119 Utah 450, 229 P.2d 289, 295, and State v. Crank, footnote 5, supra.

the opinion that the context of the majority hints at a hopeful relaxation of the Mapp case in futuro, but, as courts sometimes do, avoids it by distinction and espousal of laudatory purpose. The fact remains, I think, that under a literal interpretation of the Mapp case, a careful premeditator could murder, chop the body up, put the pieces in his car, under a blanket, race through a dozen red lights at 100 miles per hour, get arrested, object to a search of his vehicle, and after a peace officer nonetheless had taken a peek, discovered and impounded the sordid remains, the killer, driving a rented car, perhaps, would seem to be immune, under the Mapp case, from admissibility of evidence, and would go scot-free unless the corpus delicti could be shown by other evidence, perhaps completely unavailable. In my opinion, the novel results engenderable by Mapp v. Ohio ultimately should result, if not in its demise, at least, in its amelioration in favor of a rule of common sense designed to protect, not destroy, the public weal.

In our state we have such a rule of reason under Title 77–13–3, Utah Code Annotated 1953, which allows a peace officer to arrest without warrant 1) one committing a felony in his presence, 2) where the arrestee actually has committed a felony, though not in the officer's presence, and 3) *where a felony has been committed and the officer has reasonable cause to believe the arrested person committed it.* Under Title 77–13–12

a peace officer may "break open the door * * * of the building in which the person to be arrested is, or in which there are reasonable grounds for believing him to be, after demanding admittance and explaining the purpose for which admittance is desired." It would appear that the officers in this case satisfied the provisions of this statute. Our statutes largely were a codification of the common law and have stood the test of time, and it seems to me that under the circumstances and legislation here no authorities need be canvassed save those of our own state.

If it be determined as a preliminary matter that the officer had no reasonable cause to believe the accused to be the felon, that is one thing, and should be considered in determining admissibility and the quantum and quality of proof *with respect to the offense for which the accused was sought.* In like fashion the officer should be protected if factually there were such reasonable cause to believe the accused to be the felon, but in fact the officer's judgment proved inaccurate, in which case, nevertheless, admissibility of evidence as to another offense, such as a misdemeanor, would not invade the accused's rights as to the offense for which he was sought out, but would assuage the danger of recurrence of the latter.

The novelty of the Mapp decision could loom large, for example, in a hypothetical case where an officer, having reason to

believe a person to have committed adultery, enters the latter's home without a warrant, discovers no adulterous conduct, but finds conclusive evidence of a murder. Such evidence, under the Mapp case, I take it, would be inadmissible in proving the murder.

I concede that a man's home is his castle, the unlawful invasion of which gives him a right of redress civilly or by physical counter-attack. But if, during that invasion which subjects the intruder to damages, a murder is discovered, evidence of such murder should not be inadmissible because of the prior compensable invasion of the right to privacy. They are two different things, akin to a case where one unlawfully assaults another and in doing so unearths evidence of a felony. The assaulted can obtain redress for his bruises against his attacker, or could knock him out or perhaps kill him, but the assault itself should be no reason for suppression of evidence unearthed in the affray that perhaps conclusively and solely points to the fact that the one attacked was a murderer.

· It ·seems to me that there may be a difference between illegally obtained evidence and accidentally obtained evidence. In the Mapp case they did not break in to obtain evidence with respect to pornographic literature, but to investigate a felonious bombing. The illegal entry was complete when the door was sprung in an effort to accumulate evidence as to a bombing. Had Mrs. Mapp been charged with the bombing itself, I would concede that any evidence discovered as to *that* offense might be inadmissible, as offensive to the American traditional sense of fair play alone,—not necessarily because of the IV Amendment or any other amendment—although the Mapp case puts it on the latter ground,—a matter which seems to prove the growing tendency, if not insistence by the few, not the many, on the emasculation of state rights in favor of totalitarian federal ·control, heralding the ultimate destruction of the fundamental font of government in which our forebears bathed in each's blood.

In the nature of things I accept · the decisions of the Supreme Court, but reserve the right, until bondage pre-empts it, to criticize them. I reserve to the citizens of my state the same privilege with respect to *my* opinions. But here is the rub: The citizens of my state have the right and the privilege and the honor and the duty to remove me from office at the polls if I err, at a free election, but no such right, privilege, honor or duty is given the electorate so far as the federal counterparts are concerned.

With respect to the instant case, our course is clear under our state statute without any Mapp to guide us.