Argued and submitted February 21, 2018, affirmed October 16, 2019

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JASON M. SOUTH,
aka Jason Michael South,
*Defendant-Appellant.*

### Multnomah County Circuit Court
16CR30364; A163153

453 P3d 592

Defendant appeals from a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894(1). He assigns error to the trial court's denial of his motion to suppress and argues that the stopping deputy unlawfully extended the traffic stop by (1) inquiring into the presence of weapons and (2) requesting consent to search defendant's vehicle. The state argues that the deputy's questions were justified by officer safety concerns. *Held*: The trial court did not err. The deputy articulated "circumstance-specific" concerns for his safety and his decisions to inquire into the presence of weapons and request consent to search were "objectively reasonable." Therefore, because both inquiries were justified by officer-safety concerns, the deputy did not unlawfully extend the stop.

Affirmed.

Henry Kantor, Judge.

Stacy M. Du Clos, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Powers, Presiding Judge, and Ortega, Judge, and Mooney, Judge.*

POWERS, P. J.

Affirmed.

_____

* Ortega, J., *vice* Lagesen, J.; Mooney, J., *vice* Garrett, J. pro tempore.

**POWERS, P. J.**

In this criminal case, defendant appeals from a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894(1), and assigns error to the trial court's denial of his motion to suppress.[1] The issue before us is whether the arresting deputy's inquiry into the presence of weapons and subsequent request for consent to search defendant's vehicle unlawfully extended the traffic stop in violation of defendant's state constitutional rights. We hold that the trial court did not err in concluding that the deputy's inquiries were permissible for officer safety concerns and, therefore, we affirm.

We review the denial of a motion to suppress for legal error and, in so doing, "we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support them." *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). To the extent that the trial court did not make express findings regarding disputed facts, we will presume that the court found the facts in a manner consistent with its ultimate conclusion, provided that the evidence would support such findings. *Id.* at 166. We summarize the facts consistent with those standards.

Just after midnight, Deputy Jewell was monitoring traffic in the Linnton area of Portland and pulled over a suspicious dark green Jeep Grand Cherokee with an expired registration tag. According to Jewell, the Jeep was suspicious because, while the deputy was parked on the side of the road, the Jeep had driven past him twice within a short period of time. Jewell noticed the expired registration tag on the third time that the Jeep passed. Jewell turned on his patrol lights, but defendant did not immediately pull over and continued driving before turning into a parking lot.

When he approached defendant to ask for his driver's license, registration, and insurance, Jewell observed that defendant was "fidgeting around in his seat, moving very quickly, looking around the vehicle, [and] shifting his weight."

---

[1] ORS 475.894 has been amended since defendant committed his crime; however, because that amendment does not affect our analysis, we refer to the current version of the statute in this opinion.

Jewell described this as unusual behavior for a traffic stop. Jewell requested defendant's driver's license, registration, and insurance, which defendant provided. Defendant then volunteered that his driver's license was invalid. In looking at the driver's license, Jewell verified that it was, in fact, expired, and also saw that the insurance card was photo-copied and "appeared altered" because "[t]here were markings over the letters and numbers."

Based on defendant's unusual behavior, Jewell asked defendant why he was nervous, and defendant responded that he was stopped for the "same violations" and arrested for carrying a concealed handgun "several days ago." Jewell became concerned that defendant might be currently carrying a concealed handgun or that there might be weapons in the vehicle and decided to ask him as much. Jewell asked defendant if there were weapons inside his Jeep, and defendant replied, "[N]o, there's no guns." Jewell said that that was not his question and again asked if there were weapons in the Jeep. Defendant again replied, "[T]here's no guns."

Jewell returned to his patrol car to request additional officers to respond as cover units, conduct a records check, and begin writing a traffic citation. However, he did not complete the citation and instead re-approached defendant and requested defendant's consent to search the Jeep for weapons. Defendant consented. Once back-up arrived, Jewell searched the Jeep and found a pistol magazine and two "revolver speed loaders," all loaded with ammunition, as well as a "fixed blade, double-edged dagger." In the glove compartment, he found a glass pipe and a plastic baggie containing a crystalline substance, which was later determined to be methamphetamine.

Defendant was arrested and charged with, *inter alia*, unlawful possession of methamphetamine. He moved to suppress all evidence gathered from the stop, arguing that Jewell unlawfully extended the stop when he inquired about the presence of weapons and requested consent to search. The state responded by arguing that any extension of the stop was justified by officer safety concerns. At the suppression hearing, Jewell testified during cross-examination about why he felt unsafe:

"[Jewell]:   *** I felt uncomfortable sitting back at my car writing a ticket or even standing outside of my car, you know, staring into a traffic code book as well as a citation without at least keeping the majority of my view on the vehicle and [defendant].

"Q:   And why was that?

"[Jewell]:   My attention is taken away. *** [A] lot of divided attention and constantly having to watch people's actions, *** what they're doing inside of a vehicle, in addition to sitting in back there and having my face buried in a citation book, plus listening to my gut that said that 'this is very uncomfortable and don't do this.'"

Jewell described three specific reasons for his safety concerns: (1) defendant's failure to immediately pull over; (2) defendant's unusual behavior; and (3) defendant's admission that recently he was arrested for carrying a concealed handgun. He later elaborated on his misgivings:

"[A] lot of this is gut and a lot of it is training and experience. ***

"But the more I can directly observe somebody's behavior, the less likely *** [it is] going to result in some type of use of force against them or against myself. But when I'm away from them, I can't directly observe that or direct that behavior if it becomes more than just suspicious, becomes more of a safety issue if hands are out of my sight, especially when I'm by myself at a distance of maybe a car or two length, a car behind the vehicle as I was in this particular case.

"And again, my focus is looking into a ticket book and writing down information from a computer screen into the book, back to a code book, et cetera. And in those instances, there's plenty of time for somebody to get out of the car, produce a weapon, produce a handgun, and close that distance in a certain amount of time, considering that action is faster than reaction, than I can get out of my car and produce a force greater than that to protect myself or overcome that threat."

The trial court denied the motion to suppress "by a hair." The court noted that, although none of the circumstances present in this stop would ordinarily be enough to justify a traffic-stop extension based on officer safety,

defendant's admission of his recent arrest for handgun possession was "like a plus one thing." Defendant waived his right to a jury trial, and the trial court convicted him after a trial to the court.

Article I, section 9, of the Oregon Constitution protects against unlawful searches and seizures.[2] With respect to seizures, the Supreme Court has discerned three categories for citizen encounters with law enforcement: (1) "mere conversation," a noncoercive encounter that does not amount to a constitutional seizure; (2) a "stop," which is a temporary restraint on a person's liberty that is justified by the needs of an ongoing emergency or reasonable suspicion that a person is involved in criminal activity; and (3) "arrests," which are restraints on a person's liberty with the goal of charging that person with a crime and is justified by probable cause that the arrested individual committed the crime. *State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010). "The thing that distinguishes 'seizures'—that is, 'stops' and 'arrests'—from encounters that are 'mere conversation' is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Id.* at 309 (quoting *State v. Rodgers/Kirkeby* 347 Or 610, 622, 227 P3d 695 (2010)).

During a traffic stop, police inquiries do not ordinarily run afoul of the constitution because they are neither searches nor seizures. *Rodgers/Kirkeby*, 347 Or at 624. "However, police inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9." *Id.* Law enforcement may constitutionally extend a traffic stop as long as the officer's inquiries are "reasonably related" to the traffic stop. *State v. Aguirre-Lopez*, 291 Or App 78, 84-85, 419 P3d 751 (2018).

---

[2] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

In *State v. Jimenez*, 357 Or 417, 430, 353 P3d 1227 (2015), the Supreme Court held that in order to

"demonstrate that an officer's weapons inquiry is reasonably related to a traffic investigation and reasonably necessary to effectuate it, the state must present evidence that (1) the officer perceived a circumstance-specific danger and decided that an inquiry about weapons was necessary to address that danger; and (2) the officer's perception and decision to act were objectively reasonable. To determine whether that standard is met, a court must consider not only the factual circumstances that existed when the officer acted, but also the officer's articulation of the danger that the officer perceived and the reason for the officer's inquiry."

"[T]he officer's safety concerns need not arise from facts particular to the detained individual; they can arise from the totality of the circumstances that the officer faces." *Id.* at 429.

During the pendency of this appeal, the Supreme Court decided *State v. Miller*, 363 Or 374, 422 P3d 240, *adh'd to as modified on recons*, 363 Or 742, 428 P3d 899 (2018), which elaborated on the standards set forth in *Jimenez*. *Miller* addressed two issues: "(1) whether an officer's circumstance-specific perception of danger can be based entirely on circumstances that are not particular to the detained person; and (2) what a reviewing court considers to determine whether the state has proved that the officer's perception and decision were objectively reasonable." *Miller*, 363 Or at 383.

Concerning the first part of the *Jimenez* test, the court held that the state may prove "circumstance-specific" safety concerns "even if the circumstances that the officer identifies could be expected to exist for most individuals detained under similar circumstances." *Id*. Thus, an officer's circumstance-specific safety concerns may arise from general or common factors in a stop as long as the officer articulates those factors.

Regarding the second part of the *Jimenez* test—which requires the state to establish that the officer's perception and decision to inquire about weapons were objectively reasonable—the court explained that a reviewing

court must assess the reasonableness independently of the first part. *Id.* at 386 ("[O]bjective reasonableness is an independent component of the state's burden of proof, and it presents a question of law that requires an independent assessment by the court."). Assessing the "reasonableness" of the officer's circumstance-specific perceptions is not as exacting as the examination for reasonable suspicion to execute a weapons search. *Id*. at 388; *see also State v. Pichardo*, 360 Or 754, 762, 388 P3d 320 (2017) (noting that the test for determining reasonableness is "not a demanding one").

On appeal, defendant does not challenge the constitutionality of the underlying traffic stop; rather, our narrow task is to determine whether Jewell unlawfully extended the stop. Defendant contends that Jewell unlawfully extended the stop when: (1) he asked defendant if there were weapons in the Jeep, and (2) he requested defendant's consent to search the Jeep for weapons. As explained below, we conclude that Jewell's officer safety concerns justified both inquiries.

First, Jewell articulated "circumstance-specific" safety concerns that justified his question about weapons in the Jeep. Defendant did not immediately pull over; he exhibited unusual behavior including fidgeting in his seat, moving very quickly, and shifting his weight; and he volunteered that he had been arrested for carrying a concealed handgun several days earlier. Those concerns contributed to Jewell's perception of danger and prompted him to address that danger by asking defendant if there were weapons in the Jeep.

Further, we readily conclude that Jewell's question to defendant about weapons in the Jeep was objectively reasonable. Defendant's acknowledgment that he was recently arrested for carrying a concealed weapon, coupled with his unusual, nervous behavior created a reasonable and logical foundation for Jewell to inquire about weapons. Indeed, it would be anomalous if Jewell could not follow up and ask about weapons given defendant's nervous behavior and recent arrest.

Second, we similarly conclude that Jewell articulated "circumstance-specific" safety concerns that prompted his

request for defendant's consent to search the Jeep for weapons. In addition to the concerns described above, Jewell also explained that he was uncomfortable because he would be distracted by writing a citation and unable to watch defendant's movements during that time. Moreover, defendant gave evasive answers to Jewell's initial questions about the presence of weapons in the Jeep, which reasonably heightened safety concerns. Given the totality of the circumstances, we conclude that Jewell articulated sufficient officer-safety concerns to justify a request to search the Jeep.

We further conclude that Jewell's request for consent to search was objectively reasonable. First, Jewell's training and experience informed his understanding of the potential dangers that might arise during a traffic stop, which should be considered when evaluating whether he reasonably perceived a danger. *See Miller*, 363 Or at 388 ("[I]f an officer credibly testifies about an assessment of risk that is based on training and experience, it is appropriate for the court to consider that assessment."). Jewell testified, based on his training and experience, about the risks inherent in writing a traffic citation when there is a concern that weapons might be present. The record in this case, just as in *Miller*, contains "no evidence * * * [that] calls into question the officer's description of the risk to which [the officer] would be exposed," which, in this case, would have involved Jewel taking his focus off defendant to write the traffic citation. *Id.* Second, defendant's evasive answers to Jewell's questions about weapons support a determination that Jewell's perception of danger and request to search the Jeep was objectively reasonable. Defendant's responses about "no guns" injected uncertainty about the presence of weapons, and Jewell's request to search the Jeep to reduce that uncertainty is an objectively reasonable response given the totality of the circumstances. Finally, a request to search is less intrusive and qualitatively different from a search. *See Jimenez*, 357 Or at 434 (Kistler, J., concurring) ("A question is not a search. To require the same justification for both * * * fails to recognize the difference."). In short, we conclude that Jewell's request for consent to search was a measured and reasonable response to his perceived threat

of harm, and the trial court therefore did not err in denying defendant's motion to suppress.

Affirmed.